*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re BOOKER/ANTHONY, Minors.

UNPUBLISHED
November 12, 2020

No. 351237
Wayne Circuit Court
Family Division
LC No. 17-000905-NA

Before: O'BRIEN, P.J., and BECKERING and CAMERON, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's orders terminating her parental rights to her three older children (the Booker children) under MCL 712A.19b(3)(c)(*i*), (g), and (j), and to her youngest child, JRA, under MCL 712A.19b(3)(g) and (j). We affirm.

## I. BACKGROUND

Respondent has given birth to five children. In 2012, respondent's oldest daughter was placed in a guardianship with the maternal grandmother. Between 2012 and 2016, Children's Protective Services (CPS) investigated, and on occasion substantiated, complaints against respondent for improper supervision, domestic violence, physical abuse, and physical neglect of the three Booker children. In June 2017, CPS removed the Booker children after respondent reported that the family was homeless and that she was unable to provide for the three children. In July 2017, after respondent entered a plea of admission, the court assumed jurisdiction of the Booker children and ordered respondent to comply with a treatment plan. Because the case was placed on the court's "active efforts/baby-court" docket, respondent was offered intensive and individualized services. Over the two years that followed, respondent's participation in services was poor and, at best, inconsistent. In June 2018, petitioner filed a supplemental petition seeking termination of respondent's parental rights to the Booker children. The youngest child, JRA, was born shortly before the termination hearing in 2019. After JRA's birth, petitioner filed an original petition seeking termination of respondent's parental rights to JRA at the initial disposition. Both petitions were jointly tried at a hearing in September 2019. At the conclusion of the hearing, the trial court terminated respondent's parental rights to all four children. This appeal ensued.

-1-

## II. STATUTORY GROUNDS

For her first claim of error, respondent challenges the trial court's findings that the statutory grounds for termination were established by clear and convincing evidence. In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo,* 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings for clear error. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made. *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989).

The trial court terminated respondent's parental rights to the Booker children under to MCL 712A.19b(3)(c)(*i*), (g), and (j). MCL 712A.19b(3)(c)(*i*) permits termination of parental rights if:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

The conditions that led to adjudication in this case were respondent's unstable housing, anger-management problems, and mental-health issues. In the two years since the adjudication, all of these conditions continued to exist.

First, housing remained an issue. During the two years the children were in care, respondent lived in 11 different housing arrangements. At the time of the termination hearing, respondent was residing with her mother, where she had lived on and off throughout the case. Respondent's caseworker testified that, although this house was structurally appropriate, it was not suitable because there was not enough room to accommodate respondent's children. Based on this evidence, the trial court did not clearly err by finding that housing remained an issue.

As for respondent's problem with anger management, evidence was presented that respondent frequently arrived at the parenting-time visits angry, and that this anger would escalate. As a result, despite two years of services, respondent never progressed to the point where unsupervised visits were appropriate—supervision was always required because of respondent's volatile behavior. This volatile behavior was noted by the Infant Mental Health (IMH) therapist, who expressed continued concern about respondent's inability to control her anger in front of the children.[1] In addition, other evidence was presented that respondent lashed out at the children during parenting time (like telling the eldest child to go back to her "white ass mamma" after the child defended the foster parents), was hostile towards the Booker children's foster parents, and made threats of violence towards persons assisting her with her case. Based on this evidence, the

---

[1] While respondent's individual therapist testified that she believed that respondent had control over her anger-management issues, that therapist admitted that she never observed parenting time and was not aware of how respondent acted during that time.

trial court did not clearly err when it found by clear and convincing evidence that respondent continued to struggle with anger management.

Likewise, the trial court also did not clearly err by finding that respondent's mental-health issues remained unaddressed. Despite a psychological assessment being ordered, six referrals were required before respondent participated in one. The clinician reported that, when the evaluation finally took place, respondent was extremely guarded and defensive, her attitude toward the process was poor, and she responded arbitrarily to many of the psychological tests. As a result, the clinician concluded that, while respondent's profile was scorable, the results were not a meaningful reflection of her personality or any mental health concerns. Consequently, no mental health diagnosis could be made, and respondent's mental-health issues remained largely unaddressed.

Based on the foregoing, the trial court did not clearly err in finding by clear and convincing evidence that the conditions that led to adjudication continued to exist two years after the adjudication.

The remaining question is whether the trial court clearly erred when it concluded that there was no reasonable likelihood of the conditions being rectified in a reasonable time given the children's ages. Respondent contends that this conclusion was error because she was participating in services and close to rectifying the conditions that precipitated the removal of her children. However, respondent was offered intensive and individualized services for more than two years, yet she made little to no progress with removing the barriers to reunification. Further, there was nothing to suggest that things would change in the foreseeable future. When asked if there were any services that she could provide that would substantially benefit respondent and give the children a chance at stability with their mother, the IMH therapist replied, "I don't think that it can happen in a reasonable amount of time." More specifically, the therapist could not say that there would be any significant improvement within six months' time.

At the time the court found statutory grounds to terminate respondent's parental rights, respondent had yet to address, in a meaningful way, any of the conditions that caused the children to come into care, and there was no evidence that she would be able to remove the barriers to reunification anytime soon. Respondent was given ample opportunity to improve her parenting skills and establish that she could safely care for her children. She squandered this opportunity. Indeed, she informed the caseworker that she did not believe that services were necessary. Under these circumstances, it was unlikely that respondent was motivated to change her behavior in the future or put her daughters' interest ahead of his own, and the trial court did not clearly err when it concluded that that there was no reasonable likelihood of the conditions being rectified in a reasonable time given the children's ages.

In sum, the trial court did not clearly err when it found that petitioner had proven by clear and convincing evidence grounds for termination of respondent's parental rights to the Booker children under MCL 712A.19b(3)(c)(*i*). Having concluded that termination of respondent's parental rights to the Booker children was proper under MCL 712A.19b(3)(c)(*i*), we need not address whether the trial court properly terminated respondent's parental rights to the Booker children on other grounds. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

This does not end our statutory-grounds analysis, however, because the trial court did not terminate respondent's parental rights to JRA under MCL 712A.19b(3)(c)(*i*). Instead, the trial court terminated respondent's parental rights to JRA under MCL 712A.19b(3)(g) and (j). Thus, with respect to JRA, we must determine whether termination under one of those grounds was appropriate. MCL 712A.19b(3)(j) permits termination of parental rights if "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." MCL 712A.19b(3)(j) is not limited to the risk of physical harm to a child; it considers the risk of emotional harm as well. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011).

The trial court did not clearly err when it found that there was a reasonable likelihood that JRA would be harmed if returned to respondent's care. After observing respondent's parenting time, the IMH therapist was troubled by respondent's inability to understand how her words and behavior negatively impacted the children. The therapist noted that the children were uncomfortable with respondent's behavior, and they experienced fear and anxiety, which was evident by their actions of visibly withdrawing from respondent during parenting time.

There was also ample evidence that JRA would be at risk in respondent's care due to respondent's lack of parenting skills. The IMH therapist provided counseling to respondent both before and during parenting time. As part of the counseling, the therapist offered tools, encouragement, and redirection related to parenting skills. While respondent would, at times, implement some of the therapist's suggestions, moments later redirection would be required. Indeed, respondent required redirection at virtually every visit with the children. The therapist confirmed that despite intensive, hands-on assistance, respondent showed only slight progress in her parenting ability in the two years that the children were out of her care. Moreover, respondent's lack of parenting skills combined with her continuing anger-management problem posed a significant concern for the JRA's well-being if placed in respondent's care.

More generally, respondent failed to comply with her court-ordered treatment plan, which is evidence that return of JRA to respondent posed a substantial risk of harm to the child's life, physical health, and mental well-being. *In re Trejo*, 462 Mich at 346 n 3; *In re BZ,* 264 Mich App 286, 300; 690 NW2d 505 (2004). Respondent was offered a multitude of intensive and individualized services to help stabilize and strengthen the family, including IMH therapy, individual counseling, parenting time, a parent-partner, a Court Appointed Special Advocate, a psychological evaluation, and housing referrals. In the two years that the children were in care, respondent achieved, at best, partial compliance with her treatment plan. And to reach that minimal level of compliance, multiple referrals and re-referrals were required. For instance, between July 2017 and March 2019, the caseworker provided respondent with six referrals for individual counseling and six referrals for a psychological assessment. The multiple referrals were necessary because of respondent's lack of attendance and cooperation. Further, as previously explained, when respondent finally did engage with these services, she benefitted only minimally if at all. Thus, it is readily apparent from the record that respondent failed to comply with her court-ordered treatment plan, which is further evidence that JRA would be at risk of harm if placed

in respondent's home. The trial court's finding that termination of respondent's parental rights to JRA was proper under MCL 712A.19b(3)(j) was not clearly erroneous.[2]

Respondent contends that because JRA was placed in the custody of her legal father, there was insufficient evidence to terminate her parental rights under MCL 712A.19b(3)(j) because there was no evidence that JRA would be at risk of harm. Respondent asserts that it is morally reprehensible to use termination of parental rights in place of custody proceedings. Indeed, respondent argues that she was deprived due process because she was not given the same consideration that any other parent would have been given in a custody proceeding under the Child Custody Act, MCL 722.21 *et. seq.* This claim of constitutional error is unpreserved, and thus is reviewed for plain error. *In re TK,* 306 Mich App 698, 703; 859 NW2d 208 (2014). Further, respondent engages in little analysis and has neglected to provide any relevant legal authority for her argument. "A party cannot simply assert an error or announce a position and then leave it to this Court to discover and rationalize the basis for [her] claims, or unravel and elaborate for [her her] argument, and then research for authority either to sustain or reject [her] position." *Id.* at 712 (quotation marks and citation omitted.) In any event, this Court rejected a similar argument in *In re Marin*, 198 Mich App 560, 566; 499 NW2d 400 (1993). In that case, this Court acknowledged, as respondent argues here, that

> [i]t can be reasonably argued that there is no need to terminate the parental rights of one parent where the child remains in the care and custody of the other parent and there is no basis for removing the child from the custodial parent's care. While the noncustodial parent may not be a fit parent and may, in fact, as is the case here, pose a threat to the child, those concerns could be addressed through traditional custody and visitation proceedings in the circuit court, as well as, through the criminal justice system, as occurred here. [*Id*. at 565.]

This Court explicitly rejected this argument, concluding that "the Legislature envisioned and intended that the probate court could terminate the parental rights of just one parent." *Id*. at 566. Accordingly, we reject respondent's argument that the trial court erred by placing JRA in the custody of her father and terminating her parental rights to that child.

Finally, in a superficial and conclusory fashion, respondent contends that petitioner failed to make reasonable efforts to assist her in acquiring adequate housing. While it is obviously true that the petitioner must make reasonable efforts to reunite the family before a court may contemplate termination of a parent's parental rights, MCL 712A.19a(2), there is simply no support for respondent's position that petitioner failed to assist her in acquiring suitable housing. The record confirms that petitioner provided respondent with housing referrals; that a parent-

---

[2] Having concluded that termination of respondent's parental rights to JRA was proper under MCL 712A.19b(3)(j), we need not address whether termination was proper under MCL 712A.19b(3)(g). *In re HRC*, 286 Mich App at 461.

partner was assigned, in part, to assist respondent with housing[3]; that respondent was offered assistance locating housing during a stint where she resided at a shelter; and that an American Red Cross worked with respondent to secure housing in January 2019. Based on the foregoing, the record clearly refutes respondent's position that she was not provided with reasonable assistance to obtain housing.[4]

## III. BEST INTERESTS

Next, respondent challenges the trial court's finding that termination of her parental rights was in the children's best interests. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App at 90. Appellate courts "review for clear error . . . the court's decision regarding the child's best interests." *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000), superseded by statute on other grounds as recognized in *In re Moss*, 301 Mich App at 83.

The focus at the best-interest stage is on the child, not the parent. *In re Moss*, 301 Mich App at 87. The trial court should weigh all the evidence available to it in determining the child's best interests, *In re Trejo*, 462 Mich at 364, and may consider such factors as

> the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. [*In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted).]

Other factors include "a parent's history of domestic violence, . . . the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014).

The trial court did not clearly err when it found that termination of respondent's parental rights was in the children's best interests. As explained above, the evidence clearly established that respondent was unable to provide a safe and stable home for the children and that she would not be able to do so within a reasonable time. Moreover, regarding the Booker children, it was clear that the lack of stability was taking its toll on the girls. At the time of termination, the Booker children were seven, four, and three years old. They had been in care for more than two years.

---

[3] The parent-partner service was unfortunately terminated, and no re-referrals were allowed, after respondent threatened to physically harm the parent-partner.

[4] Indeed, the record tends to actually support a finding that respondent simply lacked the motivation to remove housing as a barrier to reunification. For example, in the spring of 2018, respondent resided in her cousin's home, and petitioner informed her that the house was not suitable for three children. In response, respondent indicated that she was unwilling to leave this residence. The IMH therapist also once noted that respondent was not making the effort to find housing.

While waiting for respondent to engage in her services, the girls endured multiple placements. The oldest child, who moved the most, was moved to five different placements. Fortunately, by August 2018, all three Booker children achieved some semblance of stability when they were placed together in a licensed foster home. The effects of having moved so often remained, however. The oldest child required trauma-based therapy to address post-traumatic stress disorder, and the other two Booker children were having trouble processing the lack of stability. The children were also conflicted about their relationships with respondent and the foster family. Clearly, the children were in desperate need of stability and permanence in their young lives, which could not be attained if they were forced to continue waiting for respondent to comply with services and provide the children with a safe and stable home.

Respondent asserts that termination of her parental rights was not in the children's best interests because a bond existed between them. The strength of that bond is questionable, however, in light of the evidence that the Booker children were observed withdrawing from respondent during parenting time because of respondent's negative behaviors. Moreover, a parent's bond with a child is just one factor a court is to consider in its best-interest analysis, and in this case, whatever bond existed between respondent and her children did not outweigh the children's need for a safe and stable home environment. This is supported by evidence that the Booker children were doing well in their foster care placement. By August 2018, they were finally placed together. The foster parents were meeting all of the children's needs and they had expressed a willingness to adopt the children. Both the advantages of the Booker's children's foster home—namely its providing the children with a safe and stable environment to grow—and the fact that the foster parents expressed a willingness to adopt the children weighed in favor of termination. See *In re Olive/Metts*, 297 Mich App at 41-42. Accordingly, the trial court did not clearly err when it found that termination of respondent's parental rights was in the Booker children's best interests.

Regarding JRA, when balancing all of the relevant factors, it is clear that, as with the Booker children, termination of respondent's parental rights was in JRA's best interests; respondent was unable to properly care for the child and a continued relationship with respondent would adversely affect JRA's emotional and developmental well-being.

Respondent argues that termination of her parental rights to JRA was improper because JRA was placed with her biological father. While respondent is correct that a child's placement with relatives weighs against termination, MCL 712A.19a(8)(a), JRA's biological father is not a "relative" as defined under MCL 712A.13a(1)(j), so the trial court was not required to weigh the child's placement with him against termination, *In re Schandler*, 315 Mich App 406, 413; 890 NW2d 676 (2016). Accordingly, the trial court correctly concluded that this factor should not be weighed when determining JRA's best interests.

IV. DUE PROCESS

Lastly, respondent raises constitutional due process and ineffective assistance of counsel claims related to her testimony at the termination hearing. The parental right to custody of one's child constitutes a liberty interest entitled to constitutional due-process protection. *In re Render*, 145 Mich App 344, 348; 377 NW2d 421 (1985). Due process in civil cases generally requires notice of the nature of the proceedings, and an opportunity to be heard in a meaningful time and manner by an impartial decisionmaker. *In re Juvenile Commitment Costs,* 240 Mich App 420,

440; 613 NW2d 348 (2000). Because respondent was advised of her absolute right to testify and, after conferring with counsel, chose not to testify, respondent was not deprived of a meaningful opportunity to be heard. Therefore, she cannot establish the factual predicate to support her alleged due-process violation. Indeed, respondent waived the right to assert any constitutional deprivation.

After respondent presented three witnesses in her case-in-chief, she took the stand to testify on her own behalf. Respondent initially testified that she understood that she was participating in a hearing to terminate her parental rights. Because she wanted her children returned, she requested that the court not terminate her parental rights. Respondent acknowledged that when the case began, she had an issue with her housing and contacted CPS for help. Respondent explained that she thought she would be referred to a shelter. According to respondent, CPS took her children without a court order. Respondent claimed that she was told that as long as she obtained housing, she would get her children back. When asked about her treatment plan, respondent claimed that she was never told that she needed to complete therapy or IMH services until the petition to terminate her parental rights was filed. She then admitted that she knew at the end of 2017 that individual therapy was a requirement. When asked if she had any anger issues, respondent replied, "no." Similarly, when asked if she needed assistance with her decision making, respondent replied, "no." At that point, the court briefly went off the record, and when the hearing resumed, the following colloquy occurred:

> *The Court*: Let me give her—you can continue your testimony if you prefer. I can strike all the testimony that you have given to this point in time. Do you understand that you have an absolute right to testify if you so desire?
>
> [*Respondent*]: Yes.
>
> *The Court*: Do you understand you have an absolute right not to testify if you so desire?
>
> [*Respondent*]: Yes.
>
> *The Court*: Have you had an opportunity to speak with your attorney in this regard?
>
> [*Respondent*]: Yes.
>
> *The Court*: And have you decided, based on your conversation with your attorney, that you wish to testify in your proceeding?
>
> [*Respondent*]: Yes.

After this exchange, the court asked respondent's counsel if he wished to make a statement for the record. In reply, respondent's counsel indicated that he and respondent spoke and during their conversation, he explained to respondent that her testimony might not be beneficial, but she was adamant about wanting to testify. In response to further inquiry by the trial court, respondent's counsel indicated that he would recommend that respondent not testify. When the court asked respondent if she understood that her counsel was advising her not to testify, respondent replied, "Why can't I testify though?" The following then transpired:

*The Court*: Listen to my question.

[*Respondent*]: No.

*The Court*: Now I don't have to deal with the attitude so I'm asking you a question and all you got to do is answer my question. My question to you is, do you understand that your attorney is advising that you not testify in these proceedings because your testimony may harm you more than it helps you, do you understand that statement?

[*Respondent*]: No.

*The Court*: Okay. Your attorney is saying right now that the statements that you may make in this case may affect your decision, my decision in a negative way, do you understand that?

[*Respondent*]: No.

Afterwards, the court questioned respondent if she understood that this was a termination hearing, that she had been provided with a treatment plan, and that petitioner was now asserting that she had not complied with the plan. Respondent reassured the court that she understood the nature of the proceedings. At that point, respondent's counsel interrupted, explained that he was respondent's third attorney on the case, that he had not had the case from the beginning, and that "it would be my advice not for her to testify but she's very adamant about wanting to say her peace and tell her story and that's never changed in any capacity because—." In response, the trial court stated:

I'm saying on this record that I will strike all of her testimony if she decided not to continue to testify at this point in time. I'm also saying, for the purposes of this record, that the statements that she is starting to make are hurting her more than helping her and so I am stepping out at this point to say if she wants to stop now she has an absolute right not to testify, however, she has been advised by this Court of her rights and she has been given advice by her attorney in this case. I don't know any other way to make it more clear than I've already made it so, ma'am—.

Before the court could finish its thought, respondent's counsel requested an opportunity to speak to respondent. After a brief break, the hearing resumed and the court asked if respondent wished to continue her testimony, to which respondent replied "no." The court then asked if respondent understood that she had an absolute right to testify and an absolute right not to testify. Respondent affirmed that she understood these rights. When the court indicated that it was going to strike respondent's testimony given thus far, the following transpired:

*The Court*: The court will strike all of your testimony that she has given thus far. Do you have any questions or concerns at this time, Ms. Anthony?

[*Respondent*]: So you mean to tell me I can't testify because whatever you think I am going to say is going to harm my case?

*The Court.* I'm not saying you can't testify. What I'm saying is if you say something to harm your case there's nothing I can do about it. I have to take the testimony as it's given to me. If you are 100 percent adamant about testifying then by all means continue with your testimony because it appears that you want to testify in these proceedings. What I have to say, for the purposes of the record, is that your attorney is advising you not to testify and I also have to provide you with your rights which is, you have an absolute right to testify so if you still are ready to testify I am still here and ready to listen to your testimony. We have given the appropriate rights for the purposes of the record from the Court as well as from your attorney of record so it is absolutely 100 percent your decision as to whether you want to testify or not. If you indicate that you do not want to testify I will strike all of your testimony and I believe that's the last witness so you would be closing your case, Mr. Boyd. If you decide you want to testify, that's fine too. We're ready to listen to your testimony at this time.

[*Respondent*]: I'm all right.

*The Court*: I'm sorry?

[*Respondent*]: It's all right.

*The Court*: Is it your desire not to testify at this time?

[*Respondent*]: Yeah.

*The Court*: Okay. And that is your decision and your decision only?

[*Respondent*]: Yes.

Thereafter, the court entertained closing arguments.

After reviewing the record, it is clear that the trial court expressly and unequivocally informed respondent that she could testify on her own behalf. After conferring with her attorney, respondent ultimately declined to exercise her right to testify further. Moreover, there is no record support for respondent's assertion that the court implied that its ruling would be favorable to respondent if she did not testify. Rather, the court advised respondent that, based on the nature of the testimony she had given, she was hurting her case, and that the court was required to consider any "harmful" testimony when making its decision. Respondent's highly incredible testimony given to that point likely precipitated the court's comments. Although this Court can review an untimely asserted—and therefore forfeited—right for plain error, respondent intentionally relinquished a known right when she knowingly chose not to testify. This constituted a waiver that extinguished any error. *People v Carter,* 462 Mich 206, 215-216; 612 NW2d 144 (2000). In sum, the record demonstrates that the trial court expressly and unequivocally informed respondent of her right to testify and that respondent knowingly and voluntarily waived that right. Accordingly, respondent has failed to establish that she was denied due process.

Turning to respondent's related claim of ineffective assistance of counsel, to establish a claim of ineffective assistance, respondent must establish "that (1) counsel's performance fell

below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

Nothing in the record supports respondent's claim that she was talked out of testifying against her will or was misled about testifying by her trial counsel. To the contrary, the record suggests that the trial court informed respondent of her right to testify and that respondent's counsel had advised respondent from the outset that testifying was imprudent. Even if it was respondent's counsel's recommendation that respondent not resume testifying and he persuaded respondent to acquiesce, that recommendation is presumed to be a matter of trial strategy for which this Court will not substitute its judgment. See *People v Davis,* 250 Mich App 357, 368; 649 NW2d 94 (2002) ("Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy."). It was respondent who ultimately chose not to testify after being informed on the record of her absolute right to testify.

There is nothing in the record to indicate that counsel's recommendation was unsound, or to overcome the presumption that counsel provided effective assistance. Furthermore, respondent has not attempted to show that there is a reasonable probability that the result of the proceedings would have been different if she testified. Indeed, considering the manner in which respondent had testified, it is likely that she would have effectively tarnished her credibility if she testified further. Accordingly, respondent has not established that she was deprived of the effective assistance of counsel.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Jane M. Beckering
/s/ Thomas C. Cameron

-11-